UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

WAYNE C. WARNER,

                    Plaintiff,

        v.                                          **DECISION AND ORDER**
                                                           **06-CV-0273**
JOANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

# Introduction

1.      Plaintiff Wayne C. Warner challenges an Administrative Law Judge's

("ALJ") determination that he is not entitled to disability insurance benefits ("DIB")

under the Social Security Act ("the Act").  Plaintiff alleges he has been disabled

since October 9, 1995, because of neck pain with severe headaches, chronic back

pain, arthritis in his left knee, and fatigue.  Plaintiff met the disability insured status

requirements of the Act at all times pertinent to this claim.

# Procedural History

2.      Plaintiff filed an application for DIB on July 22, 2004.  His application was

denied initially and, under the prototype model of handling claims without requiring a

reconsideration step, Plaintiff was permitted to appeal directly to the ALJ.  See 65

Fed. Reg. 81553 (Dec. 26, 2000).   Pursuant to Plaintiff's request, an administrative

hearing was held via video teleconference on July 18, 2005, before ALJ Lawrence E.

Shearer, at which time Plaintiff, his attorney, and a vocational expert appeared.  The

ALJ considered the case *de novo*, and on September 8, 2005, issued a decision

finding that Plaintiff was not disabled.  On January 5, 2006, the Appeals Council denied Plaintiff's request for review.

3.      On March 2, 2006, Plaintiff filed a Civil Complaint challenging Defendant's final decision and requesting the Court to review the decision of the ALJ pursuant to Section 205(g) and 1631(c) (3) of the Act, modify the decision of Defendant, and grant DIB benefits to Plaintiff.[1]  The Defendant filed an answer to Plaintiff's complaint on June 13, 2006, requesting the Court to dismiss Plaintiff's complaint.  Plaintiff submitted a Memorandum of Law (hereinafter called "Plaintiff's Brief") on September 14, 2006.  On October 25, 2006, Defendant filed a Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings[2] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  After full briefing, the Court deemed oral argument unnecessary and took the motions under advisement.

## Discussion

**Legal Standard and Scope of Review:**

4.      A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled.  <u>See</u> 42 U.S.C. § 405(g), 1383 (c)(3); <u>Wagner v. Sec'y of Health and Human Servs.</u>, 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will only be reversed if it is not supported by substantial evidence or there has been a legal error. <u>See</u>  <u>Grey v. Heckler</u>, 721 F.2d 41, 46 (2d Cir. 1983); <u>Marcus v. Califano</u>, 615 F.2d 23, 27 (2d Cir. 1979).

"Substantial evidence" is evidence that amounts to "more than a mere scintilla," and

---

[1] The ALJ's September 8, 2005, decision became the Commissioner's final decision in this case when the Appeals Council denied Plaintiff's request for review.

[2] Although no motion for judgment on the pleadings was filed, the moving party was excused from such filing under General Order No. 18, which states in part: "The Magistrate Judge will treat the proceeding as if both parties had accompanied their briefs with a motion for judgment on the pleadings…"

it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).  Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.  See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

5.      "To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams on Behalf of Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).  If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).  In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." Valente v. Sec'y of Health and Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

6.      The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled as defined under the Social Security Act.  See 20 C.F.R. § 404.1520, 416.920.  The United States Supreme Court recognized the validity of this analysis in Bowen v. Yuckert, 482 U.S. 137,

140-142, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987), and it remains the proper

approach for analyzing whether a claimant is disabled.

      7.     This five-step process is detailed below:

> First, the [Commissioner] considers whether the claimant is currently
> engaged substantial gainful activity.  If he is not, the [Commissioner]
> next considers whether the claimant has a "severe impairment" which
> significantly limits his physical or mental ability to do basic work activi-
> ties.  If the claimant has such an impairment, the third inquiry is whether,
> based solely on medical evidence, the claimant has an impairment
> which is listed in Appendix 1 of the regulations.  If the claimant has
> such an impairment, the [Commissioner] will consider him disabled with-
> out considering vocational factors such as age, education, and work
> experience; the [Commissioner] presumes that a claimant who is
> afflicted with a "listed" impairment is unable to perform substantial gain-
> ful activity.  Assuming the claimant does not have a listed impairment,
> the fourth inquiry is whether, despite the claimant's severe impairment,
> he has the residual functional capacity to perform his past work.  Finally,
> if the claimant is unable to perform his past work, the [Commissioner]
> then determines whether there is other work which the claimant could
> perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); see also Rosa v.

Callahan, 168 F.3d 72,77 (2d Cir. 1999); 20 C.F.R. § 404.1520.

      8.     While the claimant has the burden of proof as to the first four steps, the

Commissioner has the burden of proof on the fifth and final step.  See Bowen, 482

U.S. at 146 n.5; Ferraris v. Heckler, 728 F.2d 582 (2d Cir. 1984).  The final step of

this inquiry is, in turn, divided into two parts.  First, the Commissioner must assess

the claimant's job qualifications by considering his physical ability, age, education,

and work experience.  Second, the Commissioner must determine whether jobs

exist in the national economy that a person having the claimant's qualifications could

perform.  See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); Heckler v.

Campbell, 461 U.S. 458, 460, 103 S. Ct. 1952, 1954, 76 L. Ed. 2d 66 (1983).

9.      In this case, the ALJ made the following findings with regard to factual

information as well as the five-step process set forth above: (1) Plaintiff last met the

insured status requirements for a period of disability and disability insurance benefits

set forth in section 216(i) of the Social Security Act on June 30, 2001 (R. at 20);[3]  (2)

Plaintiff has not engaged in substantial gainful activity at any time relevant to this

decision (20 C.F.R. § 404.1520(b)) (R. at 20); (3) Through the date last insured,

Plaintiff had the following severe impairment: disorders of the back (20 C.F.R. §

404.1520(c)) (R. at 21); (4) Through the date last insured, Plaintiff did not have an

impairment or combination impairments that met or medically equaled one of the

listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1, Regulations No. 4 (20

C.F.R. § 404.1520(d)) (R. at 21); (5) Upon careful consideration of the entire record,

the ALJ found that, at least through the date insured, Plaintiff had the residual

functional capacity (RFC) to perform a limited range of light work.  Specifically,

Plaintiff was able to lift or carry 10 pounds frequently, 20 pounds occasionally; sit,

stand, or walk about 6 hours each in an 8 hour day for up to 45 minute intervals,

perform occasional bending, stooping and climbing, and never perform crouching or

squatting.  Plaintiff does not have any mental impairments that would preclude

performing unskilled to skilled work, is able to interact successfully, and is able to

maintain a regular work schedule (R. at 23); (6) Through the date last insured,

Plaintiff was unable to perform past relevant work (20 C.F.R. § 404.1565) (R. at 24);

(7) Plaintiff was born on October 23, 1942 and was 53 years old on the date last

insured, which is defined as closely approaching advanced age (20 C.F.R. §

404.1563) (R. at 24);  (8) Plaintiff has at least a high school education and is able to

---

[3] Citations to the underlying administrative are designated as "R."

communicate in English (20 C.F.R. § 404.1564) (R. at 24); and (9) Plaintiff has a skilled work background (20 C.F.R. 404.1568) (R. at 25); (10) Through the date last insured, considering Plaintiff's age, education, work experience, and residual functional capacity, Plaintiff had acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy (20 C.F.R. §§ 404.1560(c), 404.1566 and 404.1568(d)) (R. at 25); and (11) Plaintiff was not under a "disability," as defined in the Social Security Act, at any time through June 30, 2001, the date last insured (20 C.F.R. § 404.1520(g).  Ultimately, the ALJ determined Plaintiff was not entitled to a period of disability and disability insurance benefits as set forth in sections 216(i) and 223(d) of the Social Security Act (R. at 20).

**Plaintiff's Challenge:**

10.     Plaintiff challenges the decision of the ALJ on the basis that it is not supported by the substantial evidence of record.  Specifically, Plaintiff alleges (1) the ALJ did not give adequate consideration to the medical opinions and disability determination of Plaintiff's treating professionals, and instead substituted his own lay opinions for competent medical testimony, (2) the ALJ failed to properly consider Plaintiff's subjective testimony regarding pain and limitations from his impairments, as well as side effects from medications, and failed to cite specific reasons for rejecting Plaintiff's testimony, and (3) the ALJ failed to establish that Plaintiff had the residual functional capacity to perform light work on a sustained basis.  Each of Plaintiff's allegations is discussed below.

**Allegation 1: The ALJ Failed to Give Adequate Consideration to the Medical Opinions and Disability Determination Provided by Plaintiff's Treating Professionals:**

11.    Plaintiff's first challenge to the ALJ's decision is that he did not give adequate consideration to the medical evidence, and the disability determinations, provided by Plaintiff's treating physicians, Doctors Latif, Krawchenko, Peckham, and Wetterhahn,  and his chiropractor, Eleanor Campbell, and instead substituted his own lay opinion for competent medical evidence.  See Plaintiff's Brief, pp. 4-12. Thus, Plaintiff asserts the ALJ's determinations that he was not disabled prior to his date last insured of June 30, 2001, and that he retained the residual functional capacity to perform a limited range of light work during the time frame relevant to his claim, are not based on the substantial evidence of record (R. at 23).  See also Plaintiff's Brief, pp. 4-12.

According to the "treating physician's rule,"[4] the ALJ must give controlling weight to the treating physician's opinion when the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  20 C.F.R. § 404.1527(d)(2); see also Green-Younger v. Barnhart, No. 02-6133, 2003 WL 21545097, at *6 (2d Cir. July 10, 2003); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000).

Even if a treating physician's opinion is deemed not to be deserving of controlling weight, an ALJ may nonetheless give it "extra weight" under certain circumstances.  Under  C.F.R. § 404.1527(d)(1)-(6), the ALJ should consider the

---

[4] "The 'treating physician's rule' is a series of regulations set forth by the Commissioner in 20 C.F.R. SS 404.1527 detailing the weight to be accorded a treating physician's opinion." de Roman v. Barnhart, No.03-Civ.0075(RCC)(AJP), 2003 WL 21511160, at *9 (S.D.N.Y. July 2, 2003).

following factors when determining the proper weight to afford the treating physician's opinion if it is not entitled to controlling weight: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability of opinion, (4) consistency, (5) specialization of the treating physician, and (6) other factors that are brought to the attention of the court. See de Roman, 2003 WL 21511160, at *9 (citing C.F.R. § 404.1527(d)(2); see also Shaw, 221 F.3d at 134; Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

Further, an ALJ is not free to substitute his own lay opinion for opinions from treating sources.  See Brown v. Apfel, 991 F.Supp. 166, 172 (W.D.N.Y. 1998), citing Pietrunti v. Director, Office of Workers' Compensation Programs, 119 F.3d 1035, 1042 (2d Cir.1997), ("Moreover, an ALJ 'cannot arbitrarily substitute his own judgment for competent medical evidence,' " quoting McBrayer v. Sec. of H.H.S., 712 F.2d 795, 799 (2d Cir.1983)).

Having reviewed the evidence at issue, this Court detects no reversible error in the ALJ's treatment of the opinions and work capacity assessments of Plaintiff's treating physicians, Doctors Latif, Krawchenko, Peckham and Wetterhahn, as well as the opinion and work capacity assessment of Plaintiff's chiropractor, Dr. Campbell.  Rather, the ALJ's decision reflects his extensive evaluation of all the medical evidence in the record developed from the date of Plaintiff's alleged disability on October 9, 1995, through the date Plaintiff was last insured for disability benefits on June 30, 2001, and in the period between the date Plaintiff was last insured through the date of the ALJ's decision on September 8, 2005 (R. at 20-26).

The medical evidence includes treatment notes, evaluations of Plaintiff's progress, and test results (R. at 116-251). The work capacity evaluations of Chiropractor Campbell, and the statement by Dr. Wetterhahn that Plaintiff had to nap for two hours daily to "function normally during the period of time around 6/01," were inconsistent with their own records, as well as inconsistent with the medical records and opinions of Doctors Latif and Krawchenko, and State agency examining physicians, Doctors Nicholas and Peckham.

Plaintiff's medical records document that he suffers from various ailments, including hyperlipidemia, sinusitis, chronic cough, and disorders of the back; however, the ALJ determined only the disorders of the back to be a severe, but not disabling, impairment (R. at 21-24, 116-251).

On March 21, 1997, Plaintiff's chiropractor, Dr. Campbell, prepared a letter for Plaintiff's Workers' Compensation Carrier stating that, as a result of work-related injuries, Plaintiff was unable to perform the duties of his past relevant work as a New York State Trooper or as a heavy machinist (R. at 144).  However, Dr. Campbell noted Plaintiff was only "restricted from activities such as: not to lift more than 25 pounds, no extended sitting or standing or push-pull activities.  [Plaintiff] must be able to change position at will to bear and control the intensity of the pain."  Id.

Plaintiff was examined by his treating neurologist, Dr. Abdul Latif, on May 12, 1997 (R. at 153-154).  In this initial visit, Plaintiff related a history of pain from work-related accidents in 1971 and 1987 (R. at 153).  Plaintiff told Dr. Latif the pain was mostly in his neck and interscapular area, and "comes and goes."  Id.  Plaintiff denied any radiation of pain into the shoulder muscles or upper extremities, but

claimed "achy" pain in the occipital area near his eyes.  Id.  He also reported numbness and tingling sensations in his upper extremities, but no weakness in his arms.  Id.  Plaintiff also claimed "achy" pain in his lower back that had been present since the 1987 accident.  Id.  He told Dr. Latif the pain radiated towards his left hip and both legs, but denied numbness or weakness in his lower extremities.  Id.  Upon examination, Dr. Latif noted Plaintiff did not appear to be in any discomfort (R. at 154).  The examination revealed mild tenderness in the cervical spine and lumbosacral area.  Id.  Plaintiff's motor examination showed give-away weakness in his lower extremities, but the doctor noted Plaintiff seemed to be strong in his arms.  Id.  Plaintiff's muscle tone was within normal limits, and deep tendon reflexes were 1+ and symmetrical.  Id.  Romberg's testing was negative.  Id.  Straight leg raising test was positive at 75 degrees.  Id.  Dr. Latif observed Plaintiff's gait was normal.  Id.  The doctor assessed Plaintiff with cervical sprain with occipital neuralgia, but wanted to rule out cervical spondylosis and lumbosacral radiculopathy.  Id.  Dr. Latif recommended Plaintiff undergo MRI examinations of his cervical and lumbosacral spine, a vasculitis work-up, and physical therapy.  Id.

        Dr. Latif examined Plaintiff again on August 26, 1997 (R. at 151).  Plaintiff complained of low back pain radiating into his hips, but told the doctor he no longer had pain in his legs since beginning physical therapy.  Id.  Plaintiff said he continued to have neck pain and headaches.  Id.  Plaintiff's physical examination was unremarkable, with mild tenderness over the lumbosacral area, deep tendon reflexes at 2+ symmetrically, and a negative straight leg raising test bilaterally.  Id.

Dr. Latif advised Plaintiff to await permission from his insurance carrier for the MRI examinations.  Id.

On September 26, 1997, Dr. Campbell again opined Plaintiff was disabled from his jobs as a state trooper or heavy machinist, but assessed Plaintiff as capable of lifting 25 pounds or less and able to sit or stand with frequent position changes, but unable to perform activities that required bending over, or frequent push-pull activities (R. at 142).

Plaintiff was examined by Dr. Latif on October 27, 1997 (R. at 150). Plaintiff complained of lower back pain radiating into his right hip, but said his leg pain had resolved with physical therapy.  Id.  He also complained of neck pain and occipital headaches.  Id.  While Dr. Latif noted Plaintiff had mild tenderness in the cervical spine and lumbosacral area, his physical examination was mostly unremarkable.  Id.  Dr. Latif assessed Plaintiff with cervical and lumbosacral sprain, and recommended he continue with physical therapy and Baclofen, a muscle relaxer and antispastic agent.  Id.

On January 7, 1998, Dr. Latif again examined Plaintiff who reported his neck and lower back pain persisted, but denied radiation of pain into his upper and lower extremities (R. at 149).  Plaintiff also complained of occasional weakness in his right leg and knee, and occipital headaches.  Id.  His physical examination revealed mild tenderness in the cervical spine and lumbosacral areas, but was otherwise normal.  Id.  Dr. Latif recommended Plaintiff continue with Baclofen, Tylenol, and physical therapy.  Id.

Plaintiff underwent MRI scans of his cervical and lumbar spine on February 17, 1998 (R. at 145, 146).  The MRI of his cervical spine revealed mild osteoarthritic changes in the mid-cervical facets, and moderate cervical spondylosis at C6-7 with bilateral uncinate spurring and some foraminal narrowing [5](R. at 146).  No disc herniation was observed and Plaintiff's spinal cord was normal in contour and signal intensity.  Id.  The MRI scan of Plaintiff's lumbar spine showed subtle degenerative changes in the L4-5 disc, and mild degenerative disc disease at L5-S1, but without evidence of disc herniation or foraminal encroachment (R. at 145).

On March 11, 1998, Plaintiff followed up with Dr. Latif after the MRI scans of his cervical and lumbosacral spine were completed (R. at 148).  Plaintiff continued to complain of neck pain, headaches, severe lower back pain radiating into his hips, and right leg weakness.  Id.   Upon examination, Plaintiff had mild tenderness in his cervical spine, shoulder muscles, and lumbosacral area.  Id.  However, his physical examination was grossly normal, without any focal motor weakness of the upper or lower extremities.  Id.  Dr. Latif diagnosed cervical and lumbosacral spondylosis, prescribed Darvocet for pain, and recommended Plaintiff seek an opinion from a neurosurgeon for the C6-7 spondylosis.  Id.

Plaintiff was examined by Dr. Latif again on May 12, 1998 (R. at 147).  Dr. Latif noted Plaintiff's symptoms were unchanged and Plaintiff had been examined by

---

[5] Cervical spondylosis is a disorder caused by abnormal wear on the cartilage and bones of the neck (cervical vertebrae) with degeneration and mineral deposits in the cushions between the vertebrae (cervical disks).  Cervical spondylosis results from chronic degeneration of the cervical spine including the cushions between the neck vertebrae (cervical disks) and joints between the bones of the cervical spine. There may be abnormal growths or "spurs" on the vertebrae (the bones of the spine).  See http://nlm.nih.gov/MEDLINEPLUS/ency/article/000436.htm.

a neurosurgeon, Dr. Krawchenko.  Id. Dr. Krawchenko recommended laser surgery

for Plaintiff's lower back and conservative treatment for his neck symptoms.  Id.

Plaintiff's physical examination was unremarkable, with only "very mild" tenderness

in his neck and lumbosacral area.  Id.  Dr. Latif advised Plaintiff he had nothing more

to add to his care, and recommended Plaintiff follow up with Dr. Krawchenko.  Id.

On June 6, 1998, Plaintiff was examined by a State agency physician, Dr.

Elias Nicholas (R. at 237-239).  Upon examination, Plaintiff complained of

tenderness in the lower cervical spine area, but Dr. Nicholas observed the range of

motion in Plaintiff's cervical spine was uninhibited, muscle tone was normal, reflexes

in the upper extremities were symmetrical, sensory examination in the upper

extremities was normal,  and there was no evidence of disc herniation (R. at 238).

Dr. Nicholas observed Plaintiff was tender in the area of his lumbar spine, but had

no muscle spasm or deformity (R. at 239).  Straight leg raising was negative

bilaterally, and Plaintiff's reflexes were symmetrical, but depressed in his ankles and

knees.  Id.  Dr. Nicholas' assessed that Plaintiff had cervical and lumbar disc

degenerative changes aggravated by his work injuries, and recommended

conservative care including epidural blocks for Plaintiff's lower spine, if necessary

(R. at 237).  Because Plaintiff showed no frank herniation of any disc in his lumbar

spine, Dr. Nicholas opined no surgery was indicated unless Plaintiff showed further

findings or changes on an EMG.  Id.

Plaintiff underwent EMG testing on November 5, 1998 (R. at 156-157).

Per Dr. Latif, the results of the testing showed Plaintiff had moderate to severe motor

polyneuropathy of the lower extremities, with no evidence of lumbosacral radiculopathy[6] (R. at 157).

On January 12, 2000, Plaintiff was treated by his family practitioner, Dr. Joseph Wetterhahn, for sinusitis (R. at 189). Dr. Wetterhahn prescribed an antibiotic for the condition. Id. Plaintiff followed up with Dr. Wetterhahn on January 20, 2000, when the doctor diagnosed Plaintiff with bronchitis that had improved with the antibiotic that had been prescribed earlier in the month (R. at 188). Dr. Wetterhahn also prescribed the drug Zocor to treat Plaintiff's hyperlipidemia. Id.

On February 15, 2000, Plaintiff underwent an MRI of his brain in an attempt to detect if he had a pituitary tumor (R. at 155). The MRI revealed normal results. Id.

Plaintiff's neurosurgeon, Dr. Krawchenko, sent a letter of medical necessity to Plaintiff's insurance company, opining continued chiropractic treatment was necessary to treat Plaintiff's neck and right shoulder pain (R. at 241).

On January 12, 2001, January 16, 2001, and January 31, 2001, Plaintiff was treated for various conditions including bronchitis, acid reflux, chronic cough, and asthma (R. at 158, 159, 184, 185, 186).

Plaintiff was examined by Dr. Wetterhahn again on May 1, 2001, when he followed up with the doctor for treatment of hyperlipidemia and sinusitis (R. at 183). The doctor noted in Plaintiff's medical record that "He has a new problem with pain in his right shoulder. He fell off his roof when working on a snow problem earlier in

---

[6] Sensorimotor polyneuropathy is a decrease in movement or ability to feel (sensation). See http://www.nlm.nih.gov/MEDLINEPLUS/ency/article/000750.htm.

the spring.  He landed on his right wrist and then developed pain in his right

shoulder."  Id.  Dr. Wetterhahn prescribed medications to treat Plaintiff's

hyperlipidemia and sinusitis, and diagnosed the right shoulder pain as "probably

from tendinitis" and "some rotator cuff injury."  Id.  The doctor recommended range

of motion exercises and physical therapy to treat Plaintiff's right shoulder.  Id.

On November 9, 2001, Plaintiff followed up with Dr. Wetterhahn for

treatment of hyperlipidemia, allergies, and asthma (R. at 181).  He also complained

of arthritis in his hips and knees that was "interfering with his deer hunting."  Id.

Plaintiff's physical examination was unremarkable, although the doctor noted he had

gained eight pounds since his last visit.  Id.  Dr. Wetterhahn recommended Plaintiff

take over-the-counter analgesics before going deer hunting so he could get out and

exercise more.  Id.

Plaintiff was examined by Dr. Wetterhahn again on May 15, 2002 (R. at

177-178).  He reported pain in his neck, and the doctor noted Plaintiff had whiplash

injuries in 1971 and 1987, and that the pain was "intermittent," but had "gotten worse

recently" (R. at 177).  Dr Wetterhahn recommended an x-ray and MRI of Plaintiff's

cervical spine, and suggested Plaintiff exercise more to control his hyperlipidemia

(R. at 177-178).

On May 22, 2002, Plaintiff underwent an MRI scan of his cervical spine (R.

at 162).  The MRI revealed probable mild cerebellar hypoplasia and mild cervical

spondylolsis at C6-7, but without frank disc herniation or compromise of the

foramen.  Id.

Plaintiff was examined by an orthopedic surgeon, Dr. Arthur Peckham, on June 3, 2002 (R. at 247-249).  Physical examination of Plaintiff's cervical spine revealed good flexion and extension, only mildly limited and uncomfortable at the extremes (R. at 247).  Plaintiff showed no reflexes in his upper right extremity, trace to no reflexes in his upper left extremity, and trace to no reflexes in his lower extremities.  Id.  Muscle strength was 5+ throughout the upper extremities, including shoulder abduction, elbow flexion and extension, wrist extension, and grips.  Id.  Dr. Peckham reviewed Plaintiff's cervical spine x-rays taken the same day of the examination and noted the overall alignment of the cervical spine was "quite good" (R. at 248).  The doctor noted the interface between C1-2 appeared "grossly normal" and the neuroforamen appeared to be patent.  Id.  He observed "a little bit of impingement" by the joints of Luschka at the C6-7 level.  Id.  Dr. Peckham also described moderate disc space narrowing at C5-6 and C6-7 and "fairly significant spurring" at the C5-6 level.  Id.  The doctor noted there appeared to "be quite a lot" of sclerosis in the area of the ring of C1 and what looked like a "fairly severe degree of arthritis" between C1 and the dens.  Id.  Dr. Peckham's overall impression was that while Plaintiff had neck pain with headaches, this was "somewhat unusual in that it is upper neck pain."  Id.  Dr. Peckham noted Plaintiff had "questionable arthritis" at the C1-2 junction, but that "no obvious neurological findings are present at this time."  Id.  In his recommendations, the doctor stated he "knows the patient quite well and knows that he has been under a significant amount of chronic stress which may aggravate this type of problem."  Id.  He requested another MRI of Plaintiff's cervical spine before suggesting further treatment (R. at 248-249).

On April 30, 2003, Plaintiff was examined by Dr. Wetterhahn for the first time in over one year (R. at 175).  Plaintiff described aches in his joints and muscles and wondered if it might be related to Zocor.  Id.  Plaintiff's physical examination was unremarkable, and the doctor prescribed new medication to treat Plaintiff's hyperlipidemia and chronic cough.  Id.

Between May 1, 2003, and December 14, 2004, Plaintiff was treated for a variety of ailments including hyperlipidemia, non-malignant seborrheic keratosis, bronchitis and bronchiospasm, and chronic cough (R. at 164-165, 170, 171,172, 173, 174, 191-192, 193-194, 194-196, 206).  During this 19-month period of time, the record reveals only one instance when Plaintiff was treated for neck pain.  On October 22, 2003, Plaintiff followed up with Dr. Wetterhahn after treatment in an urgent care facility for bronchitis (R. at 172).  The doctor noted he refilled Plaintiff's prescription for Vicodin, which Plaintiff used "on a rare basis" for treatment of chronic neck pain.  Id.

Plaintiff's chiropractor, Dr. Campbell, completed an assessment of Plaintiff's ability to perform work related activities on September 3, 2004, approximately three and one-half years after she last examined Plaintiff (R. at 210-216).  The chiropractor assessed Plaintiff as unable to meet the requirements of a full range of sedentary work as of the last date she examined him (R. at 213-214).

On December 15, 2004, Plaintiff underwent a Work Capacity Evaluation at C.A.N.I. Spine Center (R. at 234-236).  This evaluation assessed Plaintiff's ability to lift, carry, push, pull, sit, stand, bend, reach, climb, squat, kneel, walk, and engage in

repetitive arm and leg movements (R. at 235).  Plaintiff demonstrated the ability to perform tasks in the low end of the light work category (R. at 234).

On June 25, 2005, Dr. Campbell prepared a letter at Plaintiff's request stating he "has been and continues to be totally and permanently disabled" (R. at 230).  On July 28, 2005, Dr. Wetterhahn prepared a letter for Plaintiff and Plaintiff's attorney stating that during the time frame around June 2001, Plaintiff took pain medications for his work-related neck injury and had to nap for two hours daily in order to function normally (R. at 251).

This was the last medical record in Plaintiff's administrative record available to the ALJ at the time of his decision on September 8, 2005.

After the ALJ's decision, Plaintiff submitted a hearing evaluation report to the Appeals Council (R. at 13-14).  The Appeals Council evaluated the new evidence, but determined it was not relevant to the time frame on or before the ALJ's decision (R. at 6-9).  The Appeals Council declined Plaintiff's request for review of the decision (R. at 6).

On January 11, 2008, Plaintiff, through his attorney, submitted additional medical records to the Office of Disability Adjudication and Review from the time frame March 30, 2007 through December 21, 2007.  These records reveal that on March 30, 2007, Plaintiff was examined by a nurse practitioner for complaints of bilateral leg pain and numbness in his right foot.  The nurse practitioner ordered a routine ultrasound examination to rule out a blood clot.  The results of the ultrasound examination were not included with the new records.

Dr. Wetterhahn examined Plaintiff on April 27, 2007, when he complained of back pain and a feeling "like his feet had glue on them."  Plaintiff's physical examination was unremarkable and the doctor recommended Plaintiff undergo a nerve conduction study.  Dr. Wetterhahn noted Plaintiff's chronic back pain was stable with his current treatment plan.

On November 21, 2007, Plaintiff was examined by Dr. Jason White when he complained of headaches.  Dr. White recommended CT scans of Plaintiff cervical spine and head.  These scans were completed on November 27, 2007.  The CT scan of Plaintiff's cervical spine showed degenerative disc disease at C6-7 with moderate neural foraminal narrowing and possible mild to moderate crowding of the thecal sac at C6-7.  The CT scan of Plaintiff's head was unremarkable with only minimal age-related changes.

Plaintiff was examined by Dr. Wetterhahn on December 5, 2007, when he complained of headaches.  Physical examination revealed Plaintiff had pain with neck rotation, but the rest of the examination was unremarkable.  The doctor prescribed Neurontin and referred Plaintiff to Dr. Latif.

On December 19, 2007, Plaintiff had actinic keratoses removed using both cryotherapy and excision.  The doctor noted Plaintiff tolerated the procedure well.  The biopsy report revealed Plaintiff had an atypical nevis on his forehead.

This is Plaintiff's final medical record submitted in connection with this claim.

While Plaintiff challenges the decision of the ALJ on the basis that he did not properly consider the assessment of Plaintiff's physicians and chiropractor that

Plaintiff was "totally disabled" and "unemployable" on June 30, 2001, the date of

Plaintiff was last insured for DIB, it is clear to the Court that the ALJ did carefully

consider the records and opinions of Plaintiff's treating sources.

      As an example, the ALJ noted Plaintiff was treated for leg and back pain

by his neurologist, Dr. Latif, during the time frame from mid-1997 through late 1998

(R. at 22).  During physical examinations of Plaintiff, the doctor's most significant

finding was mild tenderness in the cervical and lumbar areas of Plaintiff's spine (R.

at 22, 147, 148, 149, 150, 151, 152, 153-154).  Plaintiff had a normal gait, negative

straight leg raising, good strength and muscle tone, and negative neurological

findings.  Id.  On May 12, 1998, Dr. Latif told Plaintiff he had nothing to add to

Plaintiff's care and that Plaintiff should follow up with Dr. Krawchenko (R. at 147).

When Plaintiff underwent a nerve conduction study on November 5, 1998, Dr. Latif

assessed Plaintiff with moderate to severe motor polyneuropathy of the lower

extremities, but with no evidence of lumbosacral radiculopathy (R. at 156-157).

      As a second example, the ALJ noted Plaintiff underwent MRI scans of his

cervical and lumbar spine on February 18, 1998 (R. at 22).  Neither the cervical MRI,

nor the lumbar MRI, showed significant abnormalities (R. at 145, 146).  Plaintiff's

cervical MRI revealed mild osteoarthritic changes and moderate cervical

spondylolsis at C6-7, with bilateral uncinate spurring and some foraminal narrowing

(R. at 146).  Plaintiff's lumbar MRI revealed only subtle to mild degenerative

changes, with no evidence of disc herniation or encroachment (R. at 145).  When

Plaintiff underwent a second MRI of his cervical spine on May 22, 2002, the ALJ

observed the scan revealed only a probable mild cerebellar hypoplasia, mild cervical

spondylosis at C6-7, and no frank disc herniation or compromise of the foramen (R. at 22, 162).

The ALJ also discussed the evaluation of Dr. Peckham, who examined Plaintiff for the State Insurance Fund on June 3, 2002 (R. at 22).  Dr. Peckham's examination of Plaintiff was thorough and it revealed mostly normal results (R. at 247-249).  Dr. Peckham noted Plaintiff's complaint of neck pain with headaches was somewhat unusual since Plaintiff's pain was in his upper neck (R. at 248).  The examination revealed no neurological findings and questionable arthritis in the C1-2 junction of Plaintiff's cervical spine.  Id.

Based on the lack of significant findings in Plaintiff's numerous physical examinations, MRIs and other medical tests, his conservative treatment modalities, and his activities of daily living that included deer hunting and climbing onto a snow covered roof, the ALJ determined that Plaintiff's medical evidence for his back disorders did not meet or medically equal in severity one of the listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1, Regulations No. 4 (R. at 21-22).

Plaintiff claims the ALJ disregarded the medical opinions of Plaintiff's treating physicians and chiropractor with respect to his ability to engage in work-related activity, and substituted his own lay opinion as to Plaintiff's residual functional capacity.  See Plaintiff's Brief, pp. 8-14.  Plaintiff also claims the ALJ relied only on a Work Capacity Evaluation conducted on December 15, 2004, three and one-half years after Plaintiff's date last insured, when determining Plaintiff retained the residual functional capacity to perform a limited range of light work.  See Plaintiff's Brief, p. 10.  As examples of the opinions Plaintiff asserts the ALJ

disregarded, he points to the opinion of Dr. Campbell that Plaintiff is "totally disabled" and "unemployable," an opinion by Dr. Krawchenko that it was medically necessary for Plaintiff to continue with chiropractic treatment, and an opinion by Dr. Wetterhahn that around the time period of June 2001, Plaintiff suffered pain and sleeplessness and needed to nap for two hours daily.  See Plaintiff's Brief, pp. 9-10.

The Court notes that as a chiropractor, the opinion of Dr. Campbell is not entitled to special weight; chiropractors are not acceptable medical sources under the Commissioner's Regulations.  See 20 C.F.R. § 404.1513(a); see also Diaz v. Shalala, 59 F.3d 307, 312-314 (2d Cir. 1995).  Instead, a chiropractor is an "other source" whose information may help the ALJ understand how a claimant's impairment affects his or her ability to work.  See 20 C.F.R. 404.1513(e).  The information provided by an "other source" must be complete and detailed.  Id.

In this case, the information provided by Dr. Campbell was neither complete nor detailed.  She provided letters assessing Plaintiff's level of impairment, a Disability Determination Report, and a list of dates on which she treated Plaintiff, but no records of treatment progress notes or objective medical findings from x-rays or laboratory reports (R. at 142, 144, 210-216, 223-228, 230).  Further, the information provided by Dr. Campbell is inconsistent.  As an example, in a letter requested by Plaintiff, Dr. Campbell assessed Plaintiff as "disabled from his position as a trooper due to two work-related injuries" on March 21, 1997 (R. at 144).  However, the chiropractor restricted Plaintiff only from performing his usual duties as a trooper, or as a heavy machinist, or from any work that required (1) lifting more than 25 pounds, (2) extended sitting or standing, (3) activities that required bending

over, and (4) repetitive push/pull activities.  Id.  The chiropractor specified Plaintiff

must be able to sit or stand as needed to relieve pain.  Id.  Six months later, on

September 26, 1997, Dr. Campbell reiterated the restrictions in another letter

requested by Plaintiff (R. at 142).

On September 3, 2004, Dr. Campbell completed a Disability

Determination for Plaintiff at the request of New York State Office of Temporary and

Disability Assistance (R. at 210-216).  In this Disability Determination, she assessed

Plaintiff as capable of performing less than the full range of sedentary work as of her

last examination of him four and one-half years earlier on March 16, 2000.  Id.  No

information was provided by Dr. Campbell to suggest Plaintiff's condition

deteriorated from the date of her earlier assessment of Plaintiff's work restrictions on

September 26, 1997.  Further, as noted in the review of Plaintiff's medical records

above in this section, his physical examinations by both treating and consulting

medical doctors were relatively unremarkable, and medical findings from x-rays and

MRIs revealed only mild to moderate degenerative changes in Plaintiff's cervical and

lumbar spine.

On June 24, 2005, Dr. Campbell provided to Plaintiff yet another letter at

his request, assessing him as capable of performing far less than a limited range of

sedentary work, and noted "The patient has been and continues to be totally and

permanently disabled." (R. at 230).  It is unclear from the letter as to the time frame

for which this assessment was made.  It appears from Plaintiff's administrative

record that he began a new series of treatments with Dr. Campbell on December 2,

2004, well after his date last insured of June 30, 2001 (R. at 223-228).

Plaintiff also claims the ALJ ignored the July 28, 2005 opinion of Dr. Wetterhahn, as stated in a letter to Plaintiff, that because of Plaintiff's pain and pain medications, he needed to nap for two hours each day during the time period around June 2001 (R. at 251).   Dr. Wetterhahn's own records are inconsistent with this letter.   As an example, in January and February of 2001, Plaintiff was treated by Dr. Wetterhahn and his nurse practitioner for bronchitis, heartburn, and chronic cough (R. at 158, 159, 184, 185, 186).   Dr. Wetterhahn made no mention that Plaintiff suffered neck or back pain, and did not prescribe pain medications, or record that Plaintiff took pain medication prescribed by another source.   Id.   On May 1, 2001, Plaintiff was examined by Dr. Wetterhahn for hyperlipidemia and sinusitis, and Plaintiff told the doctor he had fallen off his roof earlier in the spring when working on a snow problem (R. at 183).   Plaintiff complained of pain in his right shoulder, and the doctor noted the pain was "probably from tendinitis."   Id.   Dr. Wetterhahn recommended range of motion exercises and physical therapy for Plaintiff's right shoulder, but did not prescribe pain medication.   Id.   When Plaintiff followed up with Dr. Wetterhahn for allergies, asthma, and hyperlipidemia on November 9, 2001, more than four months after the expiration of his date last insured for disability benefits, he complained of arthritis in his hips and knees that was "interfering with his deer hunting" (R. at 181).   Dr. Wetterhahn merely recommended Plaintiff take over-the-counter analgesics prior to going hunting, "so he can get out and exercise more."   Id.   Plaintiff did not complain to Dr. Wetterhahn of pain in his cervical spine until May 15, 2002, eleven months after the date Plaintiff was last insured for DIB (R. at 177-178).   However, an MRI of Plaintiff's cervical spine completed on May 22,

2002, showed only probable mild cerebellar hypoplasia, and mild cervical spondylolsis at C6-7, without frank disc herniation or compromise of the foramen (R. at 162).  Again, Dr. Wetterhahn did not prescribe pain medication or note that another treating physician prescribed it (R. at 177-178).  Thus, Dr. Wetterhahn's statement in his letter to Plaintiff that "you are having a lot of pain requiring pain medications" and "you had to take a two hour nap during the day in order to function normally during the period of time around 6/01" is simply not supported by the doctor's own records (R. at 251).

In his brief, Plaintiff makes much of the ALJ's reliance on a Work Capacity Evaluation completed on December 15, 2004, which showed Plaintiff retained the residual functional capacity to perform a limited range of light work (R. at 24, 235-236).  See also Plaintiff's Brief, pp. 10-12.  Plaintiff argues that because the Work Capacity Evaluation was completed three and one-half years after the expiration of Plaintiff's date last insured for disability benefits, it has little probative value to the relevant time frame for Plaintiff's claim.  Id.  However, the Court notes the December 2004 Work Capacity Evaluation is wholly consistent with the assessments of Dr. Campbell completed in March 1997 and September 1997, wherein she assessed that Plaintiff was disabled from his work as a trooper or heavy machinist, but able to perform the physical requirements of a limited range of light work (R. at 142, 144).  Further, the December 2004 Work Capacity Evaluation is consistent with the limited medical findings noted by Doctors Latif, Nicholas, Wetterhahn, and Peckham both during and after the time frame relevant to Plaintiff's claim (R. at 147-157, 158-159, 162, 177-189, 238-239, 247-249).

The ALJ did not base his assessment of Plaintiff's residual functional capacity on his lay opinion only, while ignoring overwhelming evidence that Plaintiff is under a disability, as Plaintiff claims.  <u>See</u> Plaintiff's Brief, p. 4-12.  The ALJ's assessment was supported by the detailed reports of Plaintiff's physical examinations from State agency examining physicians, Doctors Nicholas and Peckham (R. at 238-239, 247-249).  It is well settled that an ALJ is entitled to rely upon the opinions of a State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability.  <u>See</u> 20 C.F.R. §§ 404.1512(b)(6), 404.1513(c), 404.1527(f)(2), 416.912(b)(6), 416.913(c), and 416.927(f)(2); <u>see</u> <u>also</u> <u>Leach ex. Rel. Murray v. Barnhart</u>, No. 02 Civ. 3561, 2004 WL 99935, at 9 (S.D.N.Y. Jan. 22, 2004) ("State agency physicians are qualified as experts in the evaluation of medical issues in disability claims.  As such, their opinions may constitute substantial evidence if they are consistent with the record as a whole.")  Such reliance is particularly appropriate where, as here, the opinions of the State agency physician and non-examining State agency consultant are supported by the weight of the record evidence, including the medical findings of Plaintiff's examining and treating physicians.

Based on the foregoing, the Court finds the ALJ did not ignore the medical findings and opinions of Plaintiff treating physicians and chiropractor, Doctors Latif, Wetterhahn, and Campbell, but did properly reject conclusory statements, such as "The patient is listed in this office as being totally disabled.  Therefore, he is unemployable at this time," "The patient has been and continues to be totally and permanently disabled," and "you had to take a two hour nap during the day in order

to function normally during the period of time around 6/01" (R. at 144, 230, 251).
The ALJ also properly rejected the restrictive assessments of Plaintiff's residual
functional capacity completed by Dr. Campbell, as these assessments were not
supported by either records she provided, or records provided by Plaintiff's treating
physicians (R. at 210-216, 230).  It is the sole responsibility of the ALJ to weigh all
medical evidence and resolve any material conflicts in the record.   See Richardson
v. Perales, 402 U.S. 389, 399, 91 S. Ct. 1420, 1426, 28 L. Ed. 2d 842 (1971).  Under
the circumstances presented in this case, it cannot be said that the ALJ disregarded
the medical evidence from Plaintiff's treating physicians and instead substituted his
lay opinion for competent medical evidence.  Rather, the Court finds that the ALJ
carefully reviewed and acknowleged the medical evidence and opinions of Doctors
Campbell, Latif, and Wetterhahn, and rejected those opinions deemed to be
conclusory or inconsistent with the medical evidence these doctors provided in
Plaintiff's record.

>    **Allegation 2: The ALJ Failed to Consider Plaintiff's Pain and
>    Subjective Symptom Testimony and Failed to Cite Specific Reasons
>    for Rejecting Plaintiff's Testimony**

12.    Plaintiff's second allegation is that the ALJ failed to consider Plaintiff's pain
and subjective symptom testimony in determining Plaintiff was not disabled under
the Act.  See Plaintiff's Brief, pp. 12-13.  Further, Plaintiff claims the ALJ failed to
give sufficient rationale for rejecting Plaintiff's pain and subjective symptom
testimony, such that Plaintiff and subsequent reviewers could understand the ALJ's
reasoning. Id.

Plaintiff claimed that during the time frame relevant to his claim, he suffered neck pain, severe headaches, and pain in his back and hips (R. at 270).  He told the ALJ that because of pain and limitations from his back impairments, he could do little around the house except read and watch television, although in his Adult Disability Report he revealed that he often dined out with his wife, could do the dishes, drove an automobile, shopped for groceries, went to yard sales, went deer hunting, attended social gatherings, and could lift items weighing up to 25 pounds (R. at 92-97, 272-273).  Plaintiff claimed he suffered sleepiness because of his pain, and had to nap for one and one-half to two hours daily (R. at 275).  Plaintiff also claimed he suffered side effects from his medication, but when questioned by the ALJ about the medication and the side effects, Plaintiff said, "I have to take half of one [Vicodin], and combine it with Tylenol.  The whole one makes me lightheaded and very uncomfortable-feeling" (R. at 271).  The ALJ considered Plaintiff's testimony regarding his pain and symptoms, weighed the testimony against the objective medical evidence, and found that while Plaintiff's medically determinable back impairment could have been reasonably expected to produce his alleged symptoms, Plaintiff's statements concerning the intensity, duration, and limiting effects of his symptoms were not entirely credible (R. at 23).

Courts in the Second Circuit have determined pain is an important element in DIB and SSI claims, and pain evidence must be thoroughly considered. See Ber v. Celebrezze, 333 F.2d 923 (2d Cir. 1994).  Further, if an ALJ rejects a claimant's testimony of pain and limitations, he or she must be explicit in the reasons

for rejecting the testimony.  See Brandon v. Bowen, 666 F. Supp. 604, 609 (S.D.N.Y. 1997).

However, subjective symptomatology by itself cannot be the basis for a finding of disability.  A claimant must present medical evidence or findings that the existence of an underlying condition could reasonably be expected to produce the symptomatology alleged.  See 42 U.S.C. §§ 423(d)(5)(A), 1382c (a)(3)(A); 20 C.F.R. §§ 404.1529 (b), 416.929; SSR 96-7p; Gernavage v. Shalala, 882 F. Supp. 1413, 1419 (S.D.N.Y. 1995).  Moreover, a finding of disability under the Act requires more than an inability to work without pain.  See Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983).  To be considered disabling, pain must be so severe, either by itself or in combination with Plaintiff's other impairments, as to preclude any substantial gainful activity.  Id.  See also 42 U.S.C. § 423(d)(5)(A).

In this case, there is no question that Plaintiff's back disorder is a severe impairment, but his reported subjective symptoms of disabling back and neck pain, severe headaches, sleepiness and fatigue from pain, and light-headedness from medication, suggest a greater restriction of function than would be indicated by the medical evidence in the record.  Thus, the ALJ considered Plaintiff's activities on and before June 30, 2001 (the date Plaintiff was last insured for disability benefits), the type and nature of the symptoms reported, the medication and other treatment Plaintiff used to alleviate his symptoms, and any other measures he used to relieve pain (R. at 22-24).  See 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 96-7p. The ALJ's decision shows he reviewed Plaintiff's complaints of pain and other

symptoms, but found the medical and other evidence did not corroborate Plaintiff's claim of disabling pain (R. at 23).

As an example, the ALJ assessed Plaintiff had some limitations because of his back impairment, but noted his clinical testing revealed normal neurological findings, unremarkable findings during his physical examinations, and cervical and lumbar MRIs that revealed no significant abnormalities (R. at 23).  The ALJ noted that Plaintiff's activities during the year 2001 included roof repairs and deer hunting. Id.  Plaintiff's back and neck pain was treated conservatively by chiropractic adjustments, physical therapy, and medications including aspirin, Tylenol, and Vicodin.  Id.

Further, the Court finds the ALJ did provide clear and specific rational for rejecting Plaintiff's testimony of disabling pain and limitations, such that Plaintiff and subsequent reviewers could understand the ALJ's reasoning, within the body of the decision.  As an example, Plaintiff claimed he need a one and one-half to two hour nap daily to relieve fatigue caused by his pain (R. at 275).  However, the ALJ correctly noted in his decision that Plaintiff's claim was not supported by any objective evidence, and the letter attesting to Plaintiff's need for a daily two hour nap provided by Dr. Wetterhahn was not supported by the doctor's own records (R. at 24).  Further, the ALJ carefully reviewed Plaintiff's medical evidence in his decision, and noted the objective medical evidence did not provide support for Plaintiff's subjective claims of disabling pain and limitations (R. at 21-24).

In sum, the Court finds the ALJ properly considered Plaintiff's pain and symptomatology, along with the medical and other evidence in the record, and the

totality of evidence does not substantiate Plaintiff's claim that his pain and other symptoms were disabling.  Accordingly, the ALJ exercised his discretion to evaluate the credibility of Plaintiff's testimony, presented an explicit summary of his evaluation, and rendered an independent judgment regarding the extent of Plaintiff's subjective complaints based on the objective medical and other evidence (R. at 25). See e.g. Mimms v. Sec'y of Health and Human Servs., 750 F.2d 180, 196 (2d Cir. 1984).

> **Plaintiff's Third Allegation: The ALJ Failed to Establish Plaintiff Had the Residual Functional Capacity to Perform a Limited Range of Light Work on a Sustained Basis**

13.    Plaintiff's third challenge to the ALJ's decision is that the ALJ did not consider Plaintiff's ability to perform a limited range of light work on a regular and continuing basis.  See Plaintiff's Brief, p. 13-14.  However, Plaintiff's argument is based on acceptance of the work restrictions placed on Plaintiff by Dr. Chapman, acceptance of Dr. Wetterhahn's statement that Plaintiff needed a daily two hour nap during the time frame relevant to his claim, and on acceptance of Plaintiff's self-reported pain and limitations, and his claim of side effects from medications.  Id.

As discussed in Sections 11 and 12 above, the ALJ considered the chiropractic evidence of Plaintiff's disability proffered by Dr. Chapman on September 3, 2004, and June 24, 2005, but found Dr. Chapman's evidence and opinions to be from other than an acceptable medical source, and without progress notes or objective evidence to validate her opinions (R. at 23-24, 142, 144, 210-216, 223-228, 230).  Further, Dr. Chapman's opinions were inconsistent with the objective

medical findings and opinions of Plaintiff's treating physicians and State agency examining physicians.  Id.

With respect to Dr. Wetterhahn's opinion that Plaintiff required a daily two hour nap around the time period of his June 30, 2001 expiration of insured status, this opinion, too, is inconsistent with Dr. Wetterhahn's office notes and observations during the relevant time frame for Plaintiff's claim discussed in Sections 11 and 12 above (R. at 24, 155, 158-159, 160-162, 171-189, 251).  It is also inconsistent with any medical evidence proffered by Plaintiff's other treating physicians and State agency examining physicians.  Id.

In addition, the ALJ analyzed Plaintiff's credibility in Section 12 above, and while the ALJ accepted that Plaintiff had some pain and limitations resulting from his back impairment, Plaintiff's claim of total disability was not credible (R. at 23).  Thus the ALJ considered the medical opinions of Plaintiff's treating and examining physicians both during and after the time frame relevant to Plaintiff's claim, the work restrictions suggested by Dr. Chapman during the time frame relevant to Plaintiff's claim, and the work restrictions developed during Plaintiff's Work Capacity Evaluation completed in December 2004, and determined Plaintiff retained the residual functional capacity to perform a limited range of light work during the time frame relevant to his claim (R. at 21-26).

While Plaintiff argues that a Work Capacity Evaluation performed in December 2004 may not accurately reflect Plaintiff's residual functional capacity on or around his date last insured of June 30, 2001, the Court notes that Plaintiff did not provide any evidence that his condition worsened during the time from June 2001

through December 2004.  See Plaintiff's Brief, 10-11.  In fact, a review of the medical evidence pertaining to that time as set forth in Section 11 above shows Plaintiff's physical examinations were mostly unremarkable, his x-rays and MRIs revealed minimal findings, and he made relatively few complaints about back and neck pain to his treating physicians.  Thus, it was not inappropriate for the ALJ to use the December 2004 Work Capacity Evaluation, along with medical evidence and chiropractor opinions from the time frame relevant to Plaintiff's claim, to assess Plaintiff's residual functional capacity during the period around Plaintiff's date last insured for disability benefits.

The ALJ further secured the expertise of a vocational expert to assess the types of jobs available in the national and local economy that Plaintiff would have been able to do, given his capacity for a limited range of light work at the time of his date last insured (R. at 25-26, 276-287).  The vocational expert considered Plaintiff's postural limitations, including his need to be able to change from a sitting to standing position at will, and Plaintiff's education and acquired work skills from his past employment as a trooper, and determined there were significant numbers of jobs in the national and local economies that Plaintiff could perform.  Id.

Thus, the Court finds the ALJ properly analyzed the medical and other evidence in the record, and secured the testimony of a vocational expert, when determining Plaintiff could perform a limited range of sedentary work on regular and continuing basis.

## Conclusion

14.     After carefully examining the administrative record, the Court finds substantial evidence supports the ALJ's decision in this case, including the objective medical evidence and supported medical opinions.  It is clear to the Court that the ALJ thoroughly examined the record, afforded appropriate weight to all the medical evidence, including Plaintiff's treating physicians, chiropractor, and State agency examining physicians, as well as other sources, and afforded Plaintiff's subjective claims of pain an appropriate weight when rendering his decision that Plaintiff is not disabled.  The Court finds no reversible error, and further finding that substantial evidence supports the ALJ's decision, the Court will grant Defendant's Motion for Judgment on the Pleadings and deny Plaintiff's motion seeking the same.

IT IS HEREBY ORDERED, that Defendant's Motion for Judgment on the Pleadings is GRANTED.

FURTHER, that Plaintiff's Motion for Judgment on the Pleadings is denied.

FURTHER, that the Clerk of the Court is directed to take the necessary steps to close this case.

SO ORDERED.

Victor E. Bianchini
United States Magistrate Judge

Dated:  September 11, 2008
             Syracuse, New York